OPINION OF THE COURT
Michael Curci, J.
The defendant, Jose Santiago, has made a motion pro se dated September 20, 1993, in which he applies for an order vacating a mandatory surcharge in the amount of $150 plus a *350 crime victim assistance fee of $5. These charges were imposed by the court on June 21, 1993 after sentencing. (See, CPL 420.35.) The People opposed this application and submitted an affirmation in opposition, dated October 8,1993.
After due deliberation, the court denies this motion in all respects.
On June 21, 1993, this defendant was sentenced to a prison term of two to four years as a predicate felon. At the time of his sentencing, the court also imposed a mandatory surcharge of $150 plus a crime victim assistance fee of $5. The defendant, in his motion, alleges that he cannot pay this surcharge. There is some law that may consider the defendant’s motion to be premature, nevertheless, we shall consider it in order to satisfy all reasoning.
Since 1982, few changes in "surcharges” have occurred. The word mandatory had been added in 1983. Effective August 7, 1992, the court must make a record of any waiver. The details of this change are discussed at the paragraph below. It is our opinion that it is not acceptable for a court to waive the surcharge where the only ground is that the defendant is serving a long prison sentence. That doing so would not be per se sufficient to uphold the legality of such a decision.
We recommend that the Bench and Bar read the new statute set forth herein. A word to the wise to all my colleagues: it is a wise Judge who can rapidly discard the habit of the "old rules”, and assiduously apply the new rules! Some of us that fail may ultimately be caught up in some sort of conduct net.
CPL 420.30 and 420.35, as amended (eff Aug. 7, 1992), now limits the ability of the courts to waive the mandatory surcharge. CPL 420.30 (4) states that when the court decides to waive part or all of the mandatory surcharge, it must make a statement on the record of its finding of facts upon which it would base its determination. This is not the case here. This memorandum is in no way mandated by law. Nevertheless, we find it more satisfying to explain why the mandatory charges cannot be properly waived in this case. Five reasons why we find it helpful and more satisfying to explain our decision follows:
Firstly: we find our colleagues discussing just this type of problem.
Secondly: we find little similarity of treatment among all the courts. Idealistically, there should be.
*351 Thirdly: we find no case that explains and elaborates upon the law as we believe has been set forth at this memorandum.
Fourthly: often this court has experienced arguments in cases similar to the facts at bar. It can be difficult for this court when it has to repeat this relatively new law over and over again. In the past, the Bench and Bar tended to get away with summary waiver of the surcharge with no explanation, with nothing on the record, merely because the defendant was sentenced to a long incarceration. We shall keep several copies of this memorandum on the Bench. When the defense argues the point, we shall hand he or she one, and politely request that the defense counselor first read it. Then if he or she wants to reargue, or move again, we will agree to hear reargument and consider their unique facts, if any. This, of course applies only when the facts are virtually identical to the case at bar. For most of the time, we hear no cogent facts whatsoever, again we refer only to cases with a similar fact situation as the case at bar. Most lawyers base their oral few words at sentencing time strictly on incarceration per se. In some other cogent cases some defense counselors have orally established indigence. In such other cases we have declared and then held a hearing and if made out as indicated, only then waived the surcharge. These are cases that are mainly based, oddly enough, on those defendants sentenced to "out” sentences, rather than "in”; some of the grounds have been, no job, no hope of a job, no funds, no real property; some others have been ill with AIDS, T.B., also with no funds, etc. Then, after a hearing, a finding of waiver is valid. However, the Bar could save us all a great deal of time if they would kindly read the new amended statute and think it through. This, especially on sentences involving a term of incarceration as in the subject case at bar. So, this decision is also written to teach the Bar the new law and save all of us time going over same.
Fifthly: in the case at bar, this defendant is incarcerated. We first thought we would write him a letter to explain the decision, but upon reflection we find that not proper. Hence, again this memorandum satisfies. We shall, of course, mail a copy to the defendant. (Please recall he moved pro se.)
Therefore, for all of these five reasons, we thought we would save ourselves time in the future. Also, it may be helpful to the Bench and Bar.
The court may waive the surcharge if, "because of the *352 indigence of the offender, the payment of said surcharge would work an unreasonable hardship on the person convicted or his or her immediate family.” (CPL 420.35 [2].)
Defendant’s present claim of indigence is based solely on his being incarcerated. Moreover, for the purpose of collecting the mandatory surcharge from an incarcerated defendant, the State is legally entitled to money credited in an "inmate fund”, as that term is defined below.
The defendant in this case has not shown or offered sufficient proof of his indigence to warrant any waiver of the mandatory surcharge. All that the defendant offers is his characterization that the payment of this mandatory surcharge, "is impossible due to indigence.” He states that he does not own real property or other assets and his only income is his prison wages. (We emphasize these last few words because they become very important to this' decision.) The defendant, in effect, in his own affidavit in support of his motion states why his motion should be denied. The defendant is admitting that he works while in prison and receives wages for such work. The State is legally entitled to collect the mandatory surcharge from monies credited to an "inmate fund”. An "inmate fund” consists of monies that were in the possession of an inmate when he enters the system, monies earned by the inmate while in prison, and other funds received by an inmate or collected on the inmate’s behalf through deposits made to an official of the correctional facility. (See, Penal Law § 60.35; Correction Law § 187.)
In New York State, the Department of Correctional Services withholds one day’s earnings per week from inmates in order to satisfy the mandatory surcharge. In the event that an inmate receives monies from outside sources, then 50% of that money may also be withheld to satisfy the mandatory surcharge. (See, NY State Dept of Correctional Servs, Legal Dept Directive No. 2788.)
The prison system supplies inmates, on a regularly scheduled basis, with items it deems necessary to maintain proper standards of hygiene. In addition, inmates are provided with such stationary items as pens, paper, envelopes and postage. The Department of Correctional Services also supplies food, housing, electricity, medical care and some other services free of charge. Nonessential items are made readily available at reasonable prices. Therefore, the average inmate can afford the relatively small deduction for the surcharge out of his or her inmate fund.
*353 Moreover, the imposition of the mandatory surcharge does not automatically nor per se result in the incarceration of an indigent defendant. For in the event he or she cannot pay the surcharge, the defendant is entitled to a hearing. The basis for the original incarceration is, of course, the sentence for the underlying crime. Once that sentence is completed, a defendant can then move to waive the surcharge on the grounds of indigence or hardship. (See, People v West, 124 Misc 2d 622 [Yates County Ct 1984].) That is one of the reasons why this application may be premature. (See, supra.)
In this case, the defendant has stated that he is working while incarcerated and receives prison wages. This court has been informed by the counsel’s office of the Department of Correctional Services, that in practice, virtually all inmates work. That if an inmate refuses to work he is locked up in his cell while others work. Human freedom values are relative to the circumstances the person is experiencing at that time. Hence, most inmates opt to work. In this case, the defendant had a term of a minimum of two years to pay the surcharge. At $150, that is $75 per year, $1.44 per week, or about 20 cents per day. Clearly this defendant will suffer no hardship whatsoever paying this mere 20 cents per day. That is at the minimum term of two years. The maximum term was four years. We shall not dwell on the possibility that this defendant may therefore have some time between a minimum of two years, to a maximum of four years. Please note our arithmetic is based on a minimum of two years. At four years, the defendant’s daily rate goes to 10 cents per day. By reducing the argument to the absurd, we show the lack of merit, not only in defendant’s legal case, but also in his factual case.
This court will now discuss and comment upon a New York State Department of Correctional Services plan that may have the potential to impact on the ability of a very small number of inmates in paying the mandatory surcharge. The New York State Department of Correctional Services has announced that beginning on April 1, 1994, the State will cut the wages of about 350 work-release inmates in New York City. These 350 work-release inmates, now and in the past, have been paid $4.25 per hour by the State. The inmates under this special program work for nonprofit community groups four days per week and on the fifth day, the inmate was expected to look for work in the private sector. According to the Department of Correctional Services the program was designed to be a temporary stop for inmates, but too few have made the jump to the *354 private sector. Therefore, in an effort to encourage these inmates to look for public sector employment, beginning on April 1, 1994 the State will no longer pay to these inmates $4.25 per hour, but they will receive about $1 per day. The change in this program effects only a small portion of the total work-release inmates, in that the total number of work-release inmates State-wide is approximately 6,300. This is especially true if one takes into account that the total number of State prison inmates is about 64,000. This court would expect that most of the inmates who will be affected by the change in this program will find private sector employment, rather than accept the approximate $1 per day (and stay out) or go back to prison (24 hours a day). In the event this new plan causes any of the 350 inmates not to be able to pay the penalty assessment, of course, the courts would entertain an application for waiver based on indigence. However, we cannot rule on the speculation of how this may, or may not, affect 350 inmates within the City of New York out of a State-wide population grossing about 64,000.